IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **JADA MARIE PADUA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 566** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Maria Valdez** |
| **Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision
of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff
Jada Marie Padua's claim for Title II Disability Insurance Benefits ("DIB"). *See* 42
U.S. Code § 423. The parties have consented to the jurisdiction of the United States
Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow,
Plaintiff's motion for summary judgment [Doc. No. 11] is granted in part, and the
Commissioner's cross-motion for summary judgment [Doc. No. 19] is denied.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On November 12, 2010, Plaintiff filed a DIB application alleging a disability
onset date of March 13, 2010 due to fibromyalgia ("FMS"), chronic fatigue syndrome
("CFS"), depression, and anxiety. (R. 209.) Her initial claim was denied on March 7,
2011 and again upon reconsideration on June 23, 2011. (R. 112-15, 118-20.) Plaintiff

then timely requested a hearing on July 27, 2011 pursuant to 20 C.F.R. § 404.929 *et seq.* (R. 122.) A hearing was scheduled on August 1, 2012. (R.35-90.) On that day, Plaintiff appeared along with her representative and testified before an Administrative Law Judge ("ALJ"). (*Id.*) A Vocational Expert ("VE") was also present and offered testimony. (*Id.*)

## II.    FACTUAL BACKGROUND

### A.    <u>Background</u>

Plaintiff was forty-five years old at the time of her application. She has a high school education and completed two years of college in 1995. (R. 210.) She is married and lives in Plainfield, Illinois with her husband. (R. 208.) Plaintiff was a legal assistant from 1989 through 1999 and a real estate agent from 1999 through 2002. (R. 217.) Plaintiff was also a package handler at UPS from 1999 until 2000 and a receptionist at an insurance company from 2000 through 2001. (*Id.*) From 2002 through 2006, she was a chiropractor assistant, and she was a personal assistant for the State of Illinois from April 2007 through July 2008. (*Id.*) Plaintiff stopped working because of her conditions. (R. 209.)

### B.    <u>Medical Evidence</u>

#### 1.    **Treating Physicians**

Plaintiff has been a patient of Robert Carpenter, M.D., a rheumatologist, since 2005. (R. 385, 508.) She visits him around every three months. She was first diagnosed with FMS in 1996, and in July 2007, Dr. Carpenter diagnosed Plaintiff

with FMS, myositis, and depressive disorder. (R. 363, 365, 573.) Dr. Carpenter suggested exercise routines for Plaintiff. (R. 359.) In his February 2009 progress notes, Dr. Carpenter noted that Plaintiff felt very tired after waking up and did not sleep during the night. (R. 358.) She stated that she was in a lot of pain and was exercising slowly. (*Id.*) In an examination in May 2009, Plaintiff told Dr. Carpenter that she felt nerve pain between her fingers and the sensation was that of being stabbed. (R. 356.) She attended three months of physical therapy, but it did not help her improve. (*Id.*) During a physical exam on August 2009, Dr. Carpenter noted that Plaintiff's FMS remained unchanged and that her HAQ score, a measure of functional status in adults with arthritis, indicated she was "quite disabled." (R. 354.) In February 2010, Dr. Carpenter noted that Plaintiff was in terrible condition and felt pain at level 7 on a 10-point scale. (R. 348.) Plaintiff reported to Dr. Carpenter on July 2010 with feelings of depression and pain in her neck and back. (R. 342.) In August 2010, Dr. Carpenter observed that Plaintiff often felt tired and would fall asleep at a moment's notice. (R. 337.) In March 2012, she complained of terrible pain and requested hydrocodone, but Dr. Carpenter prescribed Bentyl. (R. 569.)

Plaintiff has been seeing her chiropractor, Dr. Anthony Pendolino, since 2007. (R. 573.) She first saw Dr. Pendolino because of neck pain and stiffness due to her FMS. (Id.) Dr. Pendolino noted during her original visit that she reported very severe neck pains which greatly disturbed her sleep. (*Id.*) She was unable to

concentrate and stated she was unable to perform any work. (*Id.*) Her back pains were also present but they varied in degree of intensity. (*Id.*) Plaintiff told Dr. Pendolino that she could not stand for more than thirty minutes or walk more than a half-mile before experiencing pain. (R. 574.)

On February 4, 2011, Kimberly Middleton, M.D. completed an independent medical examination of Plaintiff. (R. 458-65.) Dr. Middleton noted that Plaintiff had the tender trigger points indicating FMS in "all areas," as well as decreased range of motion. (*Id.*) After the examination, Dr. Middleton concluded that Plaintiff would be able to perform light and sedentary work. (*Id.*) Furthermore, Plaintiff was able to use both fine and gross motor hand skills, operate foot pedals, overhead reach, manage finances, communicate, and listen. (*Id.*) Dr. Middleton noted that Plaintiff complained of depression and stated that she previously sought the help of a psychiatrist. (R. 464.) She stopped treatment because she was no longer able to afford it. (*Id.*) She takes Cymbalta for her depression, but it has not helped her with her fibromyalgia. (*Id.*) Plaintiff claimed that her depression was due to her frustration with not having energy to do anything throughout the day. (*Id.*) She reported that she has mood swings and crying spells that affect her ability to concentrate. (*Id.*)

On May 31, 2011, Dr. Carpenter completed an arthritic report which diagnosed Plaintiff with FMS and indicated that Plaintiff experienced pain, tenderness, stiffness, and swelling. (R. 504-06.) He further noted Plaintiff was

significantly limited in doing repetitive reaching, handling, or fingering in both the left and right hand. (R. 505.) He also noted difficulties with waist level, shoulder level, and overhead reaching. (*Id.*) Dr. Carpenter found that Plaintiff would need to incorporate periods of walking in an eight-hour workday and would need to alternate positions for relief every fifteen minutes. Plaintiff could sit or stand for thirty minutes. (*Id.*) He concluded that Plaintiff would need a job that would permit shifting positions at will from sitting, standing, and walking. (R. 506.)

On December 28, 2011, Dr. Carpenter completed a physical capacities evaluation ("PCE"). (R. 517-20.) The evaluation repeated that Plaintiff could sit and stand/walk for less than an hour in an eight-hour workday and would require the opportunity to alternate sitting and standing throughout the day. (R. 517.) He opined that Plaintiff was unable to use her hands adequately for simple grasping, pushing, pulling, or fine manipulating. (*Id.*) Within the eight-hour workday, Plaintiff could occasionally lift up to twenty pounds, balance, and reach above shoulder level. (R. 518.) Dr. Carpenter found Plaintiff was totally restricted from activities involving heights, machinery, and changes in temperature/humidity. (R. 518.) Because of her sleeping disturbances, Plaintiff suffers from fatigue. (*Id.*) With regard to the mental effects of her pain, Dr. Carpenter found that Plaintiff's attention and concentration was moderately affected because of her pain and/or side effects of medication. (R. 519.) Dr. Carpenter diagnosed Plaintiff with FMS, chronic pain syndrome, depression, and post-traumatic stress disorder. (R. 520.) He found

that the widespread pain was present for at least three months. Dr. Carpenter also found that Plaintiff exhibited pain in at least eleven of the eighteen tender point sites consistent with FMS. (*Id.*) Dr. Carpenter noted that Plaintiff suffered from stiffness after sitting for a short period of time and suffered from fatigue that sufficiently precluded Plaintiff from engaging in full-time work, even in a sedentary position. (*Id.*) Dr. Carpenter prescribed Savella, Hydrocodone, Bentyl, and Cyclobenzaprine for treatment of her FMS symptoms and depression. (*Id.*) He noted that the pain and side effects would severely affect Plaintiff's ability to maintain attention and concentration, precluding skilled jobs or unskilled tasks at work. (*Id.*)

On March 8, 2012, Dr. Pendolino also completed a PCE for Plaintiff. (R. 545-48.) He noted that Plaintiff could sit and stand/walk for less than an hour in an eight-hour workday and would require the opportunity to alternate sitting and standing throughout the day. (R. 545.) He further noted that Plaintiff was unable to use her hands adequately for simple grasping, pushing, pulling, or fine manipulating. (*Id.*) Dr. Pendolino determined that Plaintiff could not lift or carry any amount of weight and she is unable to climb, balance, stoop, kneel, crouch, crawl, or reach above shoulder level. (R. 546.) He found Plaintiff completed restricted in activities involving heights, machinery, exposure to marked changes in temperature/humidity, automotive equipment, and exposure to dust and fumes. (*Id.*) Dr. Pendolino found Plaintiff suffered from pain due to FMS and CFS. (R. 547.) He further stated that the pain was disabling to the extent that it would prevent

Plaintiff from working a full-time position. (*Id.*) As for the mental effects of pain, Dr. Pendolino found that Plaintiff was severely limited because of her pain and medication side effects and would not have the attention or the concentration for even simple, unskilled work tasks. (R. 548.)

On April 2, 2012, Plaintiff was admitted to a hospital emergency room for full body pains. (R. 554.) She felt aches from head to toe and numbness in her arms, hands, and legs and stated she was unable to walk. (*Id.*) She was discharged from the hospital on the same day and told to discuss her medications with her physician. (R. 552.)

On an examination performed on July 27, 2012, Dr. Pendolino found that Plaintiff had spinal tenderness at various segments of her spine. (R. 574.) Pain was produced in the cervical, thoracic, and lumbar spine with active range of motion. (*Id.*) Her sitting straight leg raise test and straight leg raise test were positive bilaterally, producing lower back pain. (*Id.*) Dr. Pendolino tested for and ruled out multiple sclerosis. (R. 575.) He concluded in his exam that he found Plaintiff "totally disabled" and unable to work in any capacity. (*Id.*)

## 2. State Agency Consultants

On March 4, 2011, state agency medical consultant James Hinchen completed a physical RFC assessment. (R. 490-97.) He found that Plaintiff can occasionally lift or carry twenty pounds and frequently lift or carry ten pounds; can stand, walk, and sit for about six hours in an eight hour workday; and has an

unlimited ability to push and pull. (*Id.*) The medical consultant also found she had normal gait without assistive devices, she was 5/5 in all extremities, no spasms and no sensory deficit in her back. (*Id.*) Apart from occasional limitations in climbing and stooping, the medical consultant found Plaintiff had no other postural limitations. (R. 492.) Plaintiff also did not have limitations in manipulation, vision, communication, and in her environment. (R. 493-94.)

A mental RFC assessment was completed by state agency consulting psychologist Dr. Kirk Boyenga on March 1, 2011. (R. 486-88.) He found Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods of time and in her ability to respond appropriately to changes in the work setting. (R. 486-87.) He also found that Plaintiff was moderately limited in her ability to complete a normal workday and her ability to interact appropriately with the general public. (R. 487.) The medical consultant found no indication of in-patient, residential or other intensive interventions documenting Plaintiff's mental impairments. (R. 488.) During the examination, he noted that Plaintiff was fully oriented and free of thought disorders or serious memory problems. (*Id.*) He determined she was capable of performing simple and detailed tasks. (*Id.*) Plaintiff could also follow new directions and though her social skills may be impaired, she was capable of work in a setting with reduced interpersonal contact. (*Id.*)

Dr. Boyenga also completed a psychiatric review technique form ("PRTF") on March 1, 2011. (R. 472-85.) He based the examination on Listings 12.04 for affective

disorders and 12.06 for anxiety-related disorders. (R. 472.) He found that Plaintiff's mental impairments were secondary to her general medical condition. (R. 475.) With regard to Plaintiff's degree of limitations, he found she was moderately limited in activities of daily living but found mild restrictions in maintaining social functioning and maintaining concentration, persistence, and pace. (R. 482.) The medical consultant noted that Plaintiff could prepare simple meals and shop for groceries and household items. (R. 484.) He noted that Plaintiff has difficulty with stress and changes in routines but otherwise gets along well with authority. (*Id.*) Because of issues with her concentration, Plaintiff has difficulty with spoken or written instructions. (*Id.*) He concluded that her allegations of depression and anxiety were consistent with the treating source information and could be considered credible. (*Id.*)

### C.    Plaintiff's Testimony

While working as a legal assistant, Plaintiff's main responsibilities were completing paperwork and answering phones. (R. 42.) She sat most of the day and did not have to lift anything over ten pounds. (*Id.*) While working as a package handler for UPS, Plaintiff lifted about thirty pounds regularly and stood for most of her workday. (*Id.*) As a receptionist, Plaintiff answered phones and filed paperwork; she mainly sat for half of the day. (*Id.*) Plaintiff directed patients and performed administrative duties and ultrasounds as a chiropractic assistant. (*Id.*) When she was a personal assistant with the State of Illinois, she assisted her paraplegic

brother with his meals and making sure he had help when he fell. (R. 43.) She did not have formal training for this position and worked only a few hours. (R. 59.) She did not help him with administrative responsibilities. (*Id.*)

Plaintiff testified that her FMS causes her pain and stiffness. (R. 44.) She has difficulty walking and has trouble breathing because of inflammation. (Id.) Her legs often fall asleep and she is unable to work properly. (*Id.*) According Plaintiff's doctor, costochondritis causes her labored breathing. (R. 45.) For about five years, she has not slept adequately at night and falls asleep frequently during the day. (*Id.*) Plaintiff estimated that she sleeps an hour or two at night. (*Id.*) To cope with her FMS, Plaintiff testified that she rests frequently during the day but also engages in exercises, such as stretching, riding a stationary bike, and water therapy in her pool, as directed by Dr. Carpenter. (*Id.*) With regard to her anxiety and depression, Plaintiff testified that she feels isolated because she has lost many of friends, and her family does not understand her. (R. 46.)

The ALJ then asked Plaintiff to describe a typical day. Plaintiff testified that she wakes up in the morning and stretches before taking her medication. (*Id.*) She visits online chronic pain forums for support. (R. 47, 48.) She eats fruit and then begins her exercises, such as biking. (R. 47.) She does not cook often and her husband usually takes over when she is no longer able to finish the meal. (*Id.*) She puts the laundry in the washer and folds her clothes. (*Id.*) Plaintiff will go with her

husband to purchase groceries. (R. 48.) She has two dogs at home but does not walk them because she has a yard. (*Id.*)

When asked how many good days she has during the week, Plaintiff testified that she generally has one good day where she is able to dust, do laundry, and clean around the house. (R. 49.) She can stand for about twenty minutes to a half hour, walk about a half mile, and sit for about a half hour. (R. 49-50.) She attended massage therapy school but left after two and a half months because she was being stalked, and she also became ill again. (R. 50.)

### D.  VE Testimony

A VE was present at the hearing and offered his testimony. (R. 53.) He described Plaintiff's past work which included: (1) personal assistant, categorized as a skilled and sedentary position; (2) a chiropractor assistant, semi-skilled and light level; (3) a receptionist, semi-skilled and sedentary level; (4) a package handler, unskilled and medium level; (5) a real estate agent, skilled and light level and; (6) a legal assistant, categorized in the skilled and sedentary level. (R. 54.)

The ALJ described a hypothetical 47 year-old individual with a GED and Plaintiff's past work experience who could perform light work; could lift, carry, push and pull ten pounds frequently and twenty pounds occasionally; could stand and walk for about six hours of the eight hour workday; cannot climb; can follow only simple instructions in the workplace; and can perform only routine tasks and make simple work related decisions. The VE testified that such an individual would be

able to perform the responsibilities of a hand packer, assembler, and hand sorter. (R. 55.) The ALJ then asked if there were jobs available for the same hypothetical individual if she were restricted to sedentary work, could sit for six of the eight hours in a workday, and lift and carry up to ten pounds occasionally and lesser weights frequently. (*Id.*) The VE stated that the individual would be able to work as a hand sorter, assembler, and bench packager. (R. 56.) These are all jobs requiring a light exertional level.

The ALJ then asked whether the individual could perform the aforementioned jobs if she were to have little to no interaction with the public. The VE stated that she would be able to perform the job. The ALJ then asked if the same jobs would be available to the individual if she were to fall asleep on the workplace for a few minutes beyond her break. The VE stated that this would preclude her from all work. (*Id.*) The ALJ then asked whether the individual would find work if she were absent one day a week. The VE stated there would be no jobs available for this individual. The VE further testified that if the individual were off-task for thirty percent of the time, all work would be precluded. (*Id.*) With regard to additional breaks, such as requiring fifteen minutes after working forty-five minutes, the VE stated that this would exceed employer tolerance and there would be no work available. (R. 57.)

### E.  **ALJ Decision**

On August 20, 2012, the ALJ determined that Plaintiff was not disabled and denied the award of benefits. (R. 15-29.) As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2013 and has not engaged in substantial gainful activity ("SGA") since Plaintiff's alleged onset date of March 13, 2010. (R. 20.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of FMS, CFS, depressive disorder, and anxiety disorder. (*Id.*) At step three, the ALJ determined that Plaintiff's impairments, considered singly or combined, do not meet or equal the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) With regard to Plaintiff's mental impairments, the ALJ found that considered singly or in combination, they do not meet or equal the criteria of Listings 12.04 or 12.06 because her symptoms do not satisfy the "B" criteria. (R. 21.) At step four, the ALJ determined that Plaintiff could not perform her past relevant work but that she has the RFC to perform light work involving simple instructions, routine tasks, and simple work-related decisions, except that she cannot climb and is limited to only occasional stooping, cannot work at heights or around hazards such as dangerous machinery. (R. 22.) The ALJ concluded that based upon her age, education, work experience, and RFC, Plaintiff would be able to perform the job responsibilities of positions existing in significant numbers within the national economy, such as hand packer, assembler, and sorter. (R. 29.)

**DISCUSSION**

## I.  ALJ LEGAL STANDARD

To qualify for DIB, a claimant must be under a disability within the meaning

of the Social Security Act ("The Act"). 42 U.S.C. § 423(a)(1)(E). A disability is

defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v.*

*Walton*, 535 U.S. 212, 217–22 (2002). Pursuant to the Act, a claimant is disabled

only if his physical or mental impairments are of such severity that he is unable to

do his previous work and cannot, when "considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the

national economy, regardless of whether such work exists in the immediate area in

which he lives, or whether a specific job vacancy exists for him, or whether he would

be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). Another agency

requirement to receive disability insurance benefits is that a claimant must show he

was disabled on or before the date his insured status expired. *See* 20 C.F.R. §

404.130 for definition of disability insured status; *Stevenson v. Chater*, 105 F.3d

1151, 1154 (7th Cir. 1997).

Under the authority of the Act, the SSA has established a five-step sequential

evaluation process for determining whether a claimant is disabled. *See* 20 C.F.R. §

14

404.1520(a). This five-step sequential evaluation process requires the ALJ to make the following inquiries: 1. Is the claimant presently engaging in substantial gainful activity? *See* 20 C.F.R. § 404.1572 *et seq.*; 2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?; 3.     Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1; 4. Is the claimant unable to perform his or her former occupation?; 5. Is the claimant unable to perform any other work? 20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). A negative answer at any point, other than step three, ends the inquiry and leads to a determination that a claimant is not disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985). The claimant has the burden of establishing steps one through four. At step five the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## II.     JUDICIAL REVIEW

Because the Appeals Council denied review, the ALJ's findings constitute the final decision of the agency. *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994). The findings of the ALJ as to any fact, if supported by substantial evidence, shall be conclusive.  42 U.S.C. § 405(g); *see* also *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002); 42 U.S.C.A. § 1383 ("The final determination of the Commissioner of

Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.") Although the court affords great deference to the ALJ's determination, it must do more than merely rubber stamp the ALJ's decision. *Griffith v. Sullivan*, 916 F.2d 715 (7th Cir. 1990). In order to affirm the ALJ's decision, the court must find the decision to be supported by substantial evidence on the record as a whole, and must take into account whatever in the record fairly detracts from its weight. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). Substantial evidence is more than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kepple v. Massanari,* 268 F.3d 513 (7th Cir. 2001) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The court may not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that determination falls upon the ALJ, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the court may afford the claimant meaningful review of the ALJ's ultimate findings. *Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013). It is not enough that the record contains evidence to support the ALJ's

decision and the court must remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision, so as to prevent meaningful review. *Id.*

## III.   ANALYSIS

Plaintiff argues that the ALJ erred in her decision to deny Plaintiff's benefits because: (1) the ALJ did not give adequate weight to the medical opinion of Plaintiff's treating physicians; (2) the ALJ's credibility assessment was erroneous; and (3) the RFC determination was flawed.

### A.   Treating Physician Rule

Plaintiff first argues that the ALJ erred by failing to attribute adequate weight to the opinions of her treating physicians, Dr. Carpenter and Dr. Pendolino. The treating physician rule directs the ALJ to give controlling weight to the medical opinion of a treating physician if it is well-supported by objective evidence, such as medically acceptable clinical and laboratory diagnostic techniques, and the opinion is not inconsistent with other substantial evidence. *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); 20 C.F.R. § 404.1527(d)(2). However, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).

With regard to Dr. Carpenter, Plaintiff asserts that the ALJ offered no analysis except for mere recitations of the regulations when she determined that Dr. Carpenter's opinions were not entitled to controlling weight. As the

Commissioner correctly argues, the ALJ did not accord Dr. Carpenter's medical opinion controlling weight because she found internal contradictions within his medical opinions, particularly with regard to Plaintiff's ability to work. The ALJ pointed to an instance where Dr. Carpenter determined that Plaintiff's fatigue prevented her from sustaining full-time work activity, but he simultaneously found that she retained the ability to perform unskilled work-related tasks and even noted in March 2012 that Plaintiff's pain was not of such severity so to preclude her from working full-time. (R. 544.) The ALJ therefore offered substantial reasons for her decision not to give the entirety of Dr. Carpenter's medical opinion controlling weight.

However, even if the ALJ had legitimate reasons to discount Dr. Carpenter's medical opinion, she ultimately did not apply the correct legal standard in determining what weight it should be given. *See* 20 C.F.R. § 404.1527(d)(2); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer*, 532 F.3d 606 at 608. If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further evaluation. *O'Neill v. Colvin*, No. 13 CV 50062, 2014 WL 7051730, at *3 (N.D. Ill. Dec. 12, 2014) (citing *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010)). Instead, the ALJ must specifically determine what weight, if any, the opinion should be given. *Id.* To make this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R. § 404.1527(c)(2), such as the nature of the treatment relationship, frequency of examination, the physician's

specialty, the type of tests performed. *See Campbell*, 627 F.3d at 308. The ALJ determined that "controlling weight cannot be afforded Dr. Carpenter's opinion pursuant to 20 C.F.R. § 404.1527(d)(2)…and [she] cannot even attribute great weight to [his] opinion," (R. 26), but she failed to analyze the requisite factors. Dr. Carpenter has been seeing Plaintiff since 2005 and he frequently evaluated her; he saw her eight times in 2011 and six times in 2010. Dr. Carpenter is also the only rheumatologist on record and thus the only medical source who can offer an expert opinion on Plaintiff's FMS. Furthermore, because of their established relationship, Dr. Carpenter had the opportunity to continuously track Plaintiff's progress. *See Eakin v. Astrue*, 432 F. App'x 607, 612 (7th Cir. 2011) (unpublished opinion).

The ALJ found Dr. Carpenter's assessments to be a "reiteration of the claimant's subjective complaints" that are "not supported by clinical observations or functional assessments," (R. 26), but numerous clinical findings support the FMS diagnosis. Although a diagnosis of FMS does not by itself establish disability, *see Estok v. Apfel*, 152 F.3d 636, 650 (7th Cir. 1998), Dr. Carpenter also opined about Plaintiff's pain and non-exertional limitations such as fatigue and an inability to concentrate. The Court does not mean to require that Dr. Carpenter's opinion should be given great weight, but on remand, the ALJ should more thoroughly discuss what weight the opinion should be given under the regulations.

Plaintiff next argues that the ALJ did not accord sufficient weight to the opinions of her treating chiropractor, Dr. Pendolino, by merely giving his opinions

minimal weight. The ALJ concluded that the extreme limitations asserted in Dr. Pendolino's treatment notes were not supported by the overall record, and that Dr. Pendolino is not considered an acceptable medical source by agency regulations. According to the regulations, and for purposes of SSA disability determinations, a chiropractor is not an "acceptable medical source," cannot offer "medical opinions," *see* 20 C.F.R. § 404.1513(a); S.S.R. 06–3p, and is not considered a "treating physician." *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (distinguishing chiropractors from "treating physicians"). An ALJ may consider a chiropractor's opinions but the weight they will be given will depend on a number of factors, including the degree to which they are supported by objective evidence. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.913(d)(1); S.S.R. 06–3p; *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009).

As an initial matter, the ALJ correctly rejected Dr. Pendolino's opinion that Plaintiff was "totally disabled," which is an ultimate determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1); *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002). The Court also finds that the ALJ's reasoning with regard to acceptable medical sources to be sound, because chiropractors are not acceptable medical sources automatically deserving controlling weight. *See* 20 C.F.R. § 404.1513(a).

The ALJ gave minimal weight to Dr. Pendolino's assessment of Plaintiff's pain and functional limitations, because the extreme limitations in his report are

not supported by the record. The Court agrees that Dr. Pendolino's records do not support many of the limitations contained in his FCE. He stated that Padua could only sit, stand, or walk for less than one hour in an eight-hour workday, while her own testimony does not establish such a severe restriction. Dr. Pendolino also included limitations to no grasping or manipulation with either upper extremity, while his treatment notes contain no diagnostic assessment or even subjective complaints related to her hands; and he limited her to never lifting even five pounds, which is not supported by Dr. Pendolino's notes and contradicts the opinion of Dr. Carpenter, Plaintiff's treating rheumatologist. However, as stated above, the ALJ on remand is directed to discuss the weight to be given to Dr. Pendolino's opinion on the limitations consistent with his treatment record.

## B.    The ALJ's Credibility Determination

Plaintiff next argues that the ALJ erred when she based her adverse credibility determination on Plaintiff's reported daily activities. The ALJ's credibility determination is entitled special deference, *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."), but the ALJ is still required to build an accurate and logical bridge between the evidence and the result. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The ALJ's credibility determination will be overturned only if it is "patently wrong." *Eichstadt v. Astrue*,

534 F.3d 663, 668 (7th Cir. 2008). However, an ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results. *See* SSR 96-7P *4 (S.S.A.), 1996 WL 374186; *Bjornson v. Astrue*, 671 F.3d 640, 646; *Myles v. Astrue*, 582 F.3d 672, 676–77 (7th Cir. 2009); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Instead, an ALJ should consider other elements such as the claimant's daily activities, allegations of pain and other aggravating factors, functional limitations, and treatment, including medication. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

In her decision, the ALJ did not find Plaintiff's testimony credible because it was undermined by her daily activities. The ALJ thought Plaintiff incredible because despite allegations of daily pain and fatigue, she is able to prepare simple meals, shop, perform personal care tasks, and engage in "significant amount[s] of physical exercise." (R. 25.) The ALJ specifically notes Plaintiff's 2010 medical records which reflect that Plaintiff routinely exercised for an hour at home, including walking her dog, using an elliptical machine, riding a recumbent bicycle, and using a Pilates ball. (*Id.*) The Seventh Circuit has held that minimal daily activities do not establish that a person is capable of engaging in substantial physical activity. *See Clifford*, 227 F.3d 863 at 872; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *see also Forsythe v. Colvin*, -- F.3d --, 2016 WL 626037, at

*2 (7th Cir. Feb. 17, 2016) ("[E]xtrapolating from what people do at home, often out of necessity, to what they could do in a 40-hour-a-week job is perilous. At home one has much greater flexibility about when and how hard and how continuously to work; one can rest during the day (which one can't do in a 9-to-5 job); and sheer necessity may compel one to perform tasks at home no matter how painful . . . .").

The ALJ focused on Plaintiff's exercise regime, and while exercising can be more than minimal activity, *see Johansen*, 314 F.3d 283 at 288, the ALJ failed to adequately explore the exertional requirements of Plaintiff's activities. For example, Plaintiff testified that her typical day is spent mainly resting. She cooks, but only simple meals, and her husband takes over for her when she can no longer do it. Similarly, she does not grocery shop by herself. While failing to exert oneself on a daily basis may be a lifestyle choice, the ALJ should consider her activity level in light of all the evidence.

Plaintiff's testimony describing her exercise routine may not necessarily be inconsistent with her claims of pain. She rides her recumbent bicycle at most three times a week for approximately fifteen minutes each time and engages in water therapy once a week for fifteen minutes. (R. 45-46.) The ALJ failed to note that Plaintiff takes Vicodin before she engages in any activity, and afterwards, she finds the "closest place possible" to rest. (R. 47, 340.) The ALJ interpreted Dr. Carpenter's encouragement of Plaintiff to take on exercise, yoga, or tai chi as endorsement of her ability to perform physical activity, but her efforts to rehabilitate and follow her

23

physician's suggestion do not, by themselves, show that she can engage in work at the light level. On remand, the ALJ should examine Padua's daily activities more carefully to determine whether they require the type of performance that would be expected in a full-time job. *See Forsythe*, 2016 WL 626037, at *2; *Bjornson*, 671 F.3d at 647. The ALJ should also take into consideration Plaintiff's CFS and the side effects of her medication, which she alleges render her "very tired" throughout the day. (R. 46, 356.) The ALJ must therefore determine whether Plaintiff she can maintain concentration and effort over the full course of the work week. *See Carradine*, 360 F.3d at 755-56. By neglecting to consider Plaintiff's own testimony and other evidence on record, the ALJ impermissibly picked the information that supported her final conclusion rather than consider all the evidence. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 11] is granted in part and denied in part, and the Commissioner's cross-motion for summary judgment [Doc. No. 19] is denied. The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED.**                                  **ENTERED:**

**DATE:     February 23, 2016**            _____
                                                 **HON. MARIA VALDEZ**
                                                 **United States Magistrate Judge**